WESTERN POWER TRADING FO-
RUM and Coalition of New Mar-
ket Participants, Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

California Power Exchange
Corporation, et al.,
Intervenors.

No. 99–1532.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 26, 2001.

Decided April 10, 2001.

Ronald N. Carroll argued the cause and filed the briefs for petitioners.

Laura J. Vallance, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was Dennis Lane, Solicitor. John H. Conway, Deputy Solicitor, Lona T. Perry,

Attorney, and Susan J. Court, Special Counsel, entered appearances.

Erik N. Saltmarsh and James H. McGrew were on the brief for intervenors California Electricity Oversight Board and California Power Exchange Corporation. Scott D. Rasmussen entered an appearance.

Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

As the world well knows, California restructured its electricity market a few years ago. The current case arises out of a decision by the Federal Energy Regulatory Commission approving certain proposals allocating decisionmaking power in the modified market. In the fast-moving life of California's energy problems, all but one of the petitioners' claims have become moot. For the remaining claim, the petitioners lack standing.

\* \* \*

The case revolves around three novel state entities devised to play key roles in the new structure: (1) an Independent System Operator ("ISO"), which received control of certain power transmission assets from the state's three major investor-owned utilities and was charged with running a single statewide transmission grid; (2) a Power Exchange ("PX"), which was to be responsible for matching electricity buyers and sellers in the California market; (3) an Oversight Board, which (so far as is relevant here) was vested with review power over the composition of the ISO and PX boards and over decisions of the ISO Board. See *Pacific Gas and Electric Co.*, 77 FERC ¶ 61,204, at 61,796–98, 61,817, 1996 WL 680336 (1996) ("*1996 Order*");

see also Cal. Pub. Util.Code §§ 330–97 (West 2000).

In its *1996 Order* the Federal Energy Regulatory Commission rejected some of the then pending California arrangements. The primary grounds, as relevant to present purposes, were that the duties of the Oversight Board conflicted with the Commission's responsibilities under the Federal Power Act ("FPA") and with the "independence principle" previously adopted by the Commission in its Order No. 888, requiring that an ISO Board be independent of any market participant or group of participants. *1996 Order*, 77 FERC at 61,-817–18. See also Order No. 888, *Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 61 Fed. Reg. 21,540, 21,596 (1996), *reprinted in*, FERC Stats. & Regs. ¶ 31,036, at 31,730–31 (setting forth independence principle); *Atlantic City Electric Co.*, 77 FERC ¶ 61,148, at 61,574, 1996 WL 659535 (1996) (affirming independence principle as "bedrock" policy). Cf. *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 738 (D.C.Cir.2000) (upholding Order No. 888), *cert. granted sub nom. New York v. FERC*, —— U.S. ——, 121 S.Ct. 1185, 149 L.Ed.2d 102 (2001).

Three years later the Oversight Board sought the Commission's advance approval of provisions contained in a bill pending before the California Senate, SB 96. See Joint Appendix ("J.A.") at 2. The bill made several changes to the California restructuring, aimed at least in part at satisfying the Commission. Various sections of the bill provided that the composition of the ISO and PX boards would "remain in effect until an agreement with a participating state is legally in effect." *Id.* at 17–18; see also *id.* at 6. First, whereas

formerly the Oversight Board was authorized to appoint all members to the ISO and PX stakeholder boards, SB 96 gave it only a veto power over proposed board members of specified types: those "representing agricultural end-users, industrial end-users, commercial end-users, residential end-users, end-users at large, non-market participants, and public interest groups." *Id.* at 16; see also Cal. Pub. Util.Code § 335. Second, whereas members of the ISO and PX boards were previously required to be residents of California, SB 96 instead mandated that they be "electricity customers in the area served by" the ISO or PX. J.A. at 17; see also Cal. Pub. Util.Code §§ 337–38. Third, whereas formerly the Oversight Board was slated to enjoy very broad appellate jurisdiction, SB 96 largely confined it to "[m]atters pertaining to retail electric service or retail sales of electric energy." J.A. at 18; see also Cal. Pub. Util.Code § 339.

The petitioners here—the Western Power Trading Forum (an organization of electricity generators and marketers, municipal electric companies, power exchanges, and power marketing administrations) and the Coalition of New Market Participants (an association of participants in the California electricity markets)—intervened before the Commission, claiming that the state legislation didn't adequately address the Commission's concerns about independence and jurisdiction and effectively favored California consumers at the expense of out-of-state producers. Over their objections the Commission found that SB 96 properly limited the Oversight Board's authority to matters within the state's jurisdiction—"find[ing] that this interim role is acceptable in the unique circumstances presented by the restructuring of California electricity markets"—and granted the Oversight Board's proposed declaratory order. *California Electricity Oversight Board,* 88 FERC ¶ 61,172, at 61,576, 1999

WL 571067 (1999) ("*1999 Order*"). The Commission later denied rehearing, stressing that it had not ceded any authority or duties under the FPA. *California Electricity Oversight Board,* 89 FERC ¶ 61,-134, 1999 WL 985409 (1999). Petitioners challenge these two orders.

As a federal court, we can only adjudicate "actual, ongoing controversies." *Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). Most of this case has lost that character, thanks to a Commission order issued after initial briefing but before oral argument. Recent California legislation, spurred by the state's energy crisis, has further mooted all but one of the petitioners' claims. Since petitioners do not have standing to bring this remaining claim, we dismiss.

\* \* \*

Petitioners identify three alleged defects in SB 96. First, they argue that, because the area served by the ISO and the PX does not extend beyond the borders of California, the requirement that ISO and PX board members be electricity customers in the area served by the ISO or the PX, see Cal. Pub. Util.Code §§ 337–38, is really a "*de facto* California residency requirement" of exactly the sort rejected by the Commission's *1996 Order.* Petitioners' Br. at 35. Second, they challenge as a violation of the independence principle the Oversight Board's veto power over confirmation of ISO and PX board members, especially those representing "nonmarket participants" and "public interest classes." Petitioners' Br. at 30–33. Third, they attack the curtailed appellate review power of the Oversight Board as still encroaching on the Commission's jurisdiction. Petitioners' Br. at 36–37.

■ A later order of the Commission, not explicitly claimed by petitioners to be a response to this litigation, has radically

undermined the premises of these claims. See *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct.·894, 97 L.Ed. 1303 (1953) (voluntary cessation of conduct alone does not moot a case); *Clarke v. United States*, 915 F.2d 699, 705–06 (D.C.Cir.1990) (en banc) (changes wholly independent of litigative process do not fall under voluntary cessation doctrine). On November 1, 2000 the Commission proposed that the ISO's current stakeholder board be replaced with a seven-member non-stakeholder board and directed parties to file comments by November 22, 2000. *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System Operator and the California Power Exchange*, 93 FERC ¶ 61,121, at 61,364, 61,373, 2000 WL 1637060 (2000) ("*San Diego I*"). And on December 15, 2000 the Commission followed through, ordering that "the ISO Governing Board be replaced with a non-stakeholder Board, and that the members selected to serve on the new Board be independent of market participants." *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System Operator and the California Power Exchange*, 93 FERC ¶ 61,294, at 62,013, 2000 WL 1840337 (2000) ("*San Diego II*"). The Commission further held that members of the current stakeholder ISO Board must "turn over decisionmaking power and operating control to the management of the ISO" by January 29, 2001 (three days after oral argument of this case), retaining only an advisory role. *Id.* The Commission also stated its intention to establish further procedures "to discuss with state representatives the selection process for the new ISO Board." *Id.* The Commission did not similarly replace the PX's governing board. Instead, by releasing the investor-owned utilities from the obligation to use the PX for energy exchange transactions and terminating the PX's rate schedules effective as of the close of the April 30, 2001 trading day, it essentially dissolved the PX. *Id.* at 61,999–62,000.

The changes wrought by *San Diego II* moot the two claims that bear on the *composition* of the ISO Board—both the electricity purchase condition for membership and the provision for veto by the Oversight Board. By limiting the ISO Board to an advisory role *San Diego II* pretty much defenestrates that board, *id.* at 62,013, and leaves to the Commission's own future rulings any decision of how the new-style board will be selected.

The parallel attacks on the composition of the PX Board are also mooted, though the case is subtler. By providing for termination of the PX itself, see *id.* at 61,999–62,000, *San Diego II* puts the PX Board on the road to oblivion. Petitioners conceded at oral argument that the "Power Exchange ... under FERC's most recent orders is in the process of winding down and will be going out of business in the near future," but asserted that "unless and until it actually happens that it's not in business," their claims were not moot. Oral Argument Tr. at 23. But "[t]o satisfy the Art. III case–or–controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 70, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983). Given the normal delays of this court's mandate (for purposes of allowing petitions for rehearing), and conventional agency delay, judicial resolution of the issue could not have the slightest real-world impact before April 30 of this year, when the PX's rate schedules expire. And the petitioners have not sought to show that the PX is likely to be revived. See *City of Los An-*

*geles v. Lyons*, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

The mootness wrought by *San Diego II* is, incidentally, amplified by legislation enacted by California on January 18, 2001, Assembly Bill 5 ("An act to amend Sections 335 and 341.2 of, to add Sections 352 and 352.5 to, and to repeal and add Section 337 of, the Public Utilities Code, relating to public utilities, and declaring the urgency thereof, to take effect immediately") ("AB 5"). This act converted the existing ISO stakeholder governing board into a five-member nonstakeholder board, with all members appointed by the Governor. AB 5, § 3 (2001). Five members, selected by the Governor and approved by the Oversight Board, took their posts three days before oral argument in this case. See Letter from Vickie P. Whitney to Members of the Governing Board, California Independent System Operator (Jan. 23, 2001)(submitted under Circuit Rule 28(j)). As yet there has been no Commission evaluation of California's move.

█ Petitioners' remaining challenge is to the undue breadth, as they see it, of the Oversight Board's power to review *substantive* decisions of the ISO. The Commission staunchly argues that *San Diego II*'s changes also moot this claim, a proposition we find questionable. Though changes in the criteria for membership on the ISO Board and the Oversight Board's role in its selection might be important elements of context, they seem to leave petitioners' core claim—the risk of Oversight Board invasion of federal authority—substantially in place. See *Motor & Equipment Manufacturers Ass'n v. Nichols*, 142 F.3d 449, 458–59 (D.C.Cir.1998); *Naturist Society, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir.1992).

█ Whatever the answer on mootness for this final claim, another jurisdictional hurdle proves insuperable—the absence of standing. Only a party that is "aggrieved" by a Commission's order may obtain judicial review, 16 U.S.C. § 825*l*, and this requires a petitioner to meet both the constitutional and prudential standing requirements. *Louisiana Energy and Power Authority v. FERC*, 141 F.3d 364, 366 (D.C.Cir.1998). Constitutional standing requires (among other things) an injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations omitted). Petitioners' best shot at showing the imminence of such an injury is their claim that the Oversight Board is by statute, and has shown itself in practice, biased in favor of the "people of California," and motivated "to shift costs and burdens to out-of-state market participants." Petitioners' Br. at 19–20. *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), suggests that under some circumstances the prospect of facing adverse action by a discriminatory or biased tribunal might be enough. Petitioners submitted in support of their standing argument the transcript of an Oversight Board meeting, see Petitioners' Reply Br. Attachment A at 3; see also *Northwest Environmental Defense Center v. Bonneville Power Administration*, 117 F.3d 1520, 1527 (9th Cir.1997) (allowing affidavits to be submitted on appeal for the purpose of showing standing), from which one might perhaps infer such bias. But as in *O'Shea v. Littleton* the claimed injury remains highly speculative. The only prospective *illegality* claimed is that the Oversight Board might exercise review authority in a way (1) allowed by the *1999 Order*, but (2) unlawful under federal law. At oral argument petitioners suggested only that the *ISO* Board could direct out-of-market purchases (discretionary purchases outside of set tariffs), and

may itself be "bias[ed] to select the power, for instance, generated by the California municipal companies." Oral Argument Tr. at 21. Yet petitioners fail to trace this conduct in any way to the review power of the *Oversight* Board, much less to an illegal excess in the scope of that power deriving from the *1999 Order*. Cf. *Metcalf v. National Petroleum Council*, 553 F.2d 176, 186–87 (D.C.Cir.1977) (consumers asserting that composition of federal advisory committee would lead to higher costs for petroleum products lacked standing because the occurrence of the harm was "speculative and conjectural").

\*   \*   \*

The California electricity market is in flux. The ISO stakeholder board, which allegedly threatened the interests of non-California power producers, no longer exists; *San Diego I & San Diego II* replace it—as a matter of federal law—with a proposed seven-member non-stakeholder board to be constituted in an as yet undetermined way (and as a matter of state law AB 5 replaces it with a five-member non-stakeholder board appointed by Governor Gray Davis). Petitioners tell us that the various boards involved in the orders under review have in fact made decisions that undercut the pollyannish view of them (as petitioners see it) taken by the Commission. If so, there may be remedies in the courts or before the Commission. (The Commission could, for example, seek enforcement of *San Diego II* in a United States district court, see 16 U.S.C. § 825m, and there may be Commission proceedings by which petitioners could try to induce such action.) But no Commission decision taking or refusing to take such action is before us; petitioners identify no way in which our review of the disputed decisions could remedy the alleged ill effects of California's current institutional arrangements—other than, perhaps, by "sending a message." But message-sending is not among our powers under Article III.

The petition is

*Dismissed.*